IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02390–EWN–BNB


TAMARA J. MUHIC,

     Plaintiff,

v.

PUEBLO COMMUNITY COLLEGE,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is an employment discrimination case. Plaintiff Tamara J. Muhic alleges that

Defendant Pueblo Community College terminated her based on her gender. This matter is before

the court on "Defendant's Motion for Summary Judgment," filed on July 30, 2007. Jurisdiction is

premised upon 28 U.S.C. §§ 1331, 1343.

## FACTS

*1.*     ***Factual Background***

     *a.*     ***Preliminary Note***

     Plaintiff's factual allegations are a nightmarish labyrinth of misdirection, misinterpretation,

and outright misrepresentation. Many factual allegations are premised on blatant

mischaracterizations of the record. (*See, e.g.*, Pl.'s Resp. Br. in Opp'n to Def.'s Mem. Br. in

Supp. of its Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Statement of Additional Disputed Facts

[hereinafter "SAF"] ¶¶ 11, 24, 33, 53, 87, 94 [filed Oct. 1, 2007].)  Others offer as "fact"

statements that are so divorced from the context in which they were made as to render the

allegations meaningless.  (*See, e.g.*, *id.*, SAF ¶¶ 36, 42–43, 51, 66, 105.)  Others draw broad

conclusions from compound record citations to evidence that broadly ranges from the somewhat

supportive, to the redundant, to the wholly inapposite.  (*See, e.g.*, *id.*, SAF ¶¶ 9, 63–64, 110.)

And others draw sweeping inferences from extremely narrow evidence.  (*See, e.g.*, *id.*, SAF ¶¶

46–48, 101.)  Still others are premised on patently inadmissible hearsay statements.  (*See, e.g.*,

SAF ¶¶ 2, 3, 27.)

The court emphasizes that it bases its rulings upon the evidentiary record and, thus, will

not be swayed by the liberties Plaintiff's counsel has taken with the record.  I remind counsel that

his role in opposing summary judgment is not to make up *issues of fantasy*, but rather to "set out

*specific facts*" established by appropriate evidence that "show[] a *genuine* issue for trial."  Fed. R.

Civ. P. 56(e)(2) (2008) (emphases added).  Counsel's chicanery serves only to cast doubt upon

his candor and attenuate Plaintiff's case.

### b.    Facts

Defendant is a community college located in Pueblo, Colorado.  (Def.'s Mem. Br. in

Supp. of its Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts

[hereinafter "SOF"] ¶ 1 [filed July 30, 2007]; *admitted at* Pl.'s Resp., Resp. to Statement of

Undisputed Material Facts [hereinafter "RSOF"] ¶ 1.)  On February 6, 2002, Defendant hired

Plaintiff to oversee its maintenance, grounds, and housekeeping departments.  (*Id.*, SOF ¶¶ 2, 4,

10; *admitted at* Pl.'s Resp., RSOF ¶¶ 2, 4, 10.) Plaintiff was the first female to hold the position. (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., RSOF ¶ 3.)

From February 2002 through August 2004, Mike Reid was Plaintiff's supervisor. (*Id.*, SOF ¶¶ 5, 7; *admitted at* Pl.'s Resp., RSOF ¶¶ 5, 7.) Plaintiff's predecessor was Robert McGregor. (Pl.'s Resp., Ex. 29 at 15 [Reid Dep.].) In hiring Plaintiff, Mr. Reid hoped to see significant improvements over Mr. McGregor's management. (*Id.*) Mr. Reid had recommended that Plaintiff be hired over a male candidate because Plaintiff's references stated that she was "collegial" and had a talent for "bringing out the best in people." (Def.'s Br., SOF ¶¶ 5–7; *admitted at* Pl.'s Resp., RSOF ¶¶ 5–7.) In contrast, the male candidate's references stated he was "forceful," "pushy," and "had a tendency to step on toes." (*Id.*)

### i.     *Plaintiff's Early Tenure*

When Plaintiff started her job, she discovered that the employees she oversaw were accustomed to sleeping, drinking, smoking marijuana, perusing pornography, gambling, and leaving work while on the clock. (Pl.'s Resp., Ex. 27 ¶ 18 [Pl. Aff.].) Plaintiff also discovered that the employees frequently stole money and property from Defendant. (*Id.*) Plaintiff felt that there was no management system in place, so it fell to her to make order out of the existing chaos. (*Id.*, Ex. 28 at 19–20 [Pl. Dep.].)

On balance, Mr. Reid felt that the new expectations Plaintiff established for her employees were appropriate. (*Id.*, Ex. 29 at 37 [Reid Dep.].) However, Mr. Reid recalled that some of Plaintiff's subordinates complained that Plaintiff would write them up for minor infractions, such as returning from break one or two minutes late. (*Id.*)

In a performance evaluation for the period running from April 2002 through May 2003, Mr. Reid rated Plaintiff's overall performance as "Outstanding." (Pl's Resp., Ex. 15 at 33, 37 [2002–2003 Eval.].)[1] This rating was the second highest of four possible rankings. (*Id.*) The evaluation included a self-assessment in which Plaintiff wrote: (1) "Occasionally[,] my frustration has resulted in negative interactions with staff and customers;" and (2) "My attempts to increase policy enforcement, accountability and productivity have been aggressive and I haven't always effectively managed the impact on others." (Def.'s Br., SOF ¶ 12; *admitted at* Pl.'s Resp., RSOF ¶ 12.) In response to this self-assessment, Mr. Reid noted "[Plaintiff was] aware of her weaknesses and [was] making significant progress" toward "developing a wider skill set in managing people." (*Id.*, SOF ¶ 13; *admitted at* Pl.'s Resp., RSOF ¶ 13.) Mr. Reid proceeded to offer strong praise of Plaintiff's overall efforts. (*See* Pl's Resp., Ex. 15 at 33–37 [2002–2003 Eval.].)

### ii.    *Early 2004: Employee Complaints*

As of early 2004, Plaintiff believes that some of her staff began filing complaints against her in a conspiracy "to smear [her] reputation and create a hostile work environment." (*See id.*, Ex. 27 ¶¶ 22–23 [Pl. Aff.].) Plaintiff testified that, in early 2004, she and Mr. Reid had "a lot of

---

[1]Contrary to both common practice and this court's local rules, Plaintiff's brief contains voluminous exhibits comprised of numerous *distinct* documents, many of which are repeated from one exhibit to the next. (*See, e.g.*, Pl.'s Resp., Ex. 1 [ninety-five pages of emails], Ex. 15 [107 pages of random materials], Ex. 20 [104 pages of random materials]); *see also* D.C.COLO.LCivR 56.1(C). I admonish Plaintiff for forcing the court to waste its time rifling through countless pages of exhibits to confirm her citations. I also point Defendant to Local Rule 56.1(C)(1) for the proper convention for numbering its exhibits.

conversations" during which she attributed the complaints against her to the fact that some employees "do not like to have a woman tell them no, they don't like to have a woman who . . . sets rules for them, I mean, they don't like to hear it anyway, and it's twice as worse [sic] because it's coming from me." (*Id.*, Ex. 28 at 30–31 [Pl. Dep.].) Although Defendant investigated some of the complaints, it found that none were valid. (*See id.*, Ex. 15 at 61, 67 [Duran Reports], Ex. 15 at 30 [Email Regarding Work-Study Complaint].)

In April 2004, members of Plaintiff's housekeeping staff brought a volley of complaints of a "hostile work environment." (*Id.*, Ex. 29 at 91–92 [Reid Dep.].) These complaints were directed at Plaintiff and another supervisor, Ed Trujillo. (*Id.*, Ex. 15 at 71 [3/16/04 Email], Ex. 29 at 91–92 [Reid Dep.]; *accord id.*, SAF ¶¶ 33–34; *admitted in relevant part at* Def.'s Reply, SAF ¶¶ 33–34.) Defendant determined that all of the complaints were spurious. (*Id.*, Ex. 29 at 91–92 [Reid Dep.].)

Thus, in April 2004, Mr. Reid and Defendant's president, Dr. Mike Davis, brought in Defendant's "system attorney" to speak to Plaintiff's staff about the meaning of "hostile work environment" under federal law and to clarify that changes to a work schedule or work duties did not constitute harassment. (Pl.'s Resp., Ex. 28 at 41 [Pl. Dep.]; *see id.*, Ex. 15 at 82 [4/28/04 Email], Ex. 15 at 84–85 [4/28/04 Meeting Minutes].) Plaintiff testified:

> Q: And so it sounds like Mike Reid was supporting you throughout [April 2004]?
> A: He was.

(*Id.*, Ex. 28 at 42 [Pl. Dep.].)

In April 2004, Dr. Davis, Mr. Reid, and Human Resources Director Patricia Ruybal met and agreed to hire a new person to supervise the grounds and housekeeping staff, which had previously been Plaintiff's responsibility. (Def.'s Br., Ex. WW at 2 [4/6/04 Emails].) The reasons for the change are murky, but it appears it was made in an attempt to reorganize the structure of managers under Plaintiff's supervision.[2] (*See id.*) Plaintiff accepted the change and the new structure, but was disappointed that she was not called upon to participate in the hiring process for the new director of grounds and housekeeping. (Pl.'s Resp., Ex. 28 at 66–67, 112 [Pl. Dep.].)

In June 2004, Mr Reid completed an evaluation of Plaintiff's work from June 2003 through May 2004. (*Id.*, Ex. 15 at 87–94 [2003–2004 Eval.].) Therein, Mr. Reid noted Plaintiff's satisfactory performance of her job duties, stating that Plaintiff's "strength is clearly in understanding facility needs and providing professional expertise in campus projects." (*Id.*, Ex. 15 at 90 [2003–2004 Eval.].) Mr. Reid continued:

> [Plaintiff's] management and leadership skills are not presently adequate for this position as it is defined. Restructuring the position and department this year should help in this area but significant attention and effort needs to be made in obtaining and developing the necessary skills to deal with the daily demands this position requires. Managing people, not projects, is the most critical aspect of this position.

(*Id.*, Ex. 15 at 91 [2003–2004 Eval.].) Mr. Reid gave Plaintiff the third lowest overall score, "Meets Expectations." (*Id.*, Ex. 15 at 93 [2003–2004 Eval.].)[3]

---

[2]The actual reason for the change is of little significance, since Plaintiff does not contend that it constituted an adverse action. (*See* Pl.'s Resp.)

[3]Citing to Ms. Ruybal's recollection that Mr. Reid told her he was getting "tired of the complaints" of Plaintiff's staff, Plaintiff asserts this performance review "was Reid's retaliation

### iii.     *Mr. Gallegos Assumes Management of Grounds and Housekeeping*

On August 1, 2004, Defendant hired Dan Gallegos as the director of grounds and housekeeping.  (*Def.'s Br., SOF ¶ 31; admitted at* Pl.'s Resp., RSOF ¶ 31; *see* Def.'s Br., Ex. S at 1 [Gallegos Aff.].)  Thereafter, Plaintiff was only responsible for overseeing Defendant's maintenance department.  (*See id.*)

Plaintiff had a golf cart that she used to move about Defendant's campus.  (*See* Pl.'s Resp., Ex. 28 at 78 [Pl. Dep.].)  On or about August 3, 2004, Plaintiff's secretary, Suzanne Carter, permitted Mr. Gallegos to use Plaintiff's golf cart without Plaintiff's knowledge or permission.  (*Def.'s Br., SOF ¶ 41; admitted in relevant part at* Pl.'s Resp., RSOF ¶ 41.)  When Plaintiff learned Ms. Carter had allowed Mr. Gallegos to borrow the golf cart, Plaintiff became

---

against [Plaintiff] after [he] got 'tired' of dealing with the baseless complaints of the disgruntled employees."  (Pl.'s Resp., RSOF ¶ 26 [citing Ex. 31 at 77–78 (Ruybal Dep.)]; *accord id.*, SAF ¶¶ 44–48.)  As this argument is entirely premised on inadmissible hearsay, it warrants no further consideration.  *See Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) ("Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment.").

Even if the argument were not premised on hearsay, it would still fail because Plaintiff's evidence does not support her conclusions.  At the cited portion of her deposition, Ms. Ruybal stated:

> [Mr. Reid] did tell me he . . . had several employees in his office complaining, and he was getting tired of the complaints.  And from what he told me, the two shifts of employees, I guess there was like an A team and a B team, or I don't recall the correct term for them, they were just always at each other, basically.  They just did not work together at all.  They were very divided.

(Pl.'s Resp., Ex. 31 at 77 [Ruybal Dep.].)  This testimony does not suggest that Mr. Reid was "retaliating" against Plaintiff for *anything* — particularly not for drawing sexist complaints from her staff.

visibly upset with Ms. Carter and yelled at her. (*Id.*, SOF ¶ 43; *deemed admitted at* Pl.'s Resp., RSOF ¶ 43; Def.'s Br., Ex. O ¶ 12 [Carter Aff.].)[4]

On August 4, 2004, Ms. Carter told Mr. Reid and Dr. Davis that she would no longer work for Plaintiff. (*Id.*, Ex. O ¶ 13 [Carter Aff.].) The same day, Mr. Gallegos attempted to introduce himself to Plaintiff, who dismissed him and shut the door in his face. (Def.'s Br., SOF ¶ 34; *deemed admitted at* Pl.'s Resp., RSOF ¶ 34; *see also* Def.'s Br., Ex. S at 1 [Gallegos Aff.].)[5] Later that same day, Mr. Reid called on Plaintiff to discuss her behavior. (Pl.'s Resp., Ex. 29 at

---

[4]Plaintiff denies this assertion based on two inapposite pieces of evidence. First, Plaintiff relies on the affidavit statement of one John H. McLain: "I never heard [Plaintiff] yell or rave as some people have accused her. I never heard [Plaintiff] raise her voice even though we worked together every day for [over three] years." (Pl.'s Resp., Ex. 24 ¶ 24 [McLain Decl.].) Second, Plaintiff cites to her own deposition, where she stated: "I think I was pretty firm [with Ms. Carter], I couldn't tell you if my voice was louder than it normally is." (*Id.*, Ex. 28 at 83 [Pl. Dep.].) Because neither piece of evidence undermines Defendant's asserted fact number forty-three, the fact remains undisputed and is deemed admitted.

[5]Plaintiff denies this allegation on a number of grounds, none of which disproves the asserted fact. First, Plaintiff argues that Defendant's citation fails to support the asserted fact. (*See* Pl.'s Resp., RSOF ¶ 34.) This is wrong. The cited material is an affidavit in which Mr. Gallegos recounts the alleged incident in detail. (*See* Def.'s Br., Ex. S at 1 [Gallegos Aff.].) Second, Plaintiff asserts that it was impossible to slam her door due to a "closure device" on her door. (Pl.'s Resp., RSOF ¶ 34 [citing Ex. 27 ¶ 50 (Pl. Aff.)].) Plaintiff fails to point this court, however, to any evidence suggesting she was not dismissive of Mr. Gallegos or that she did not close her door — however slowly — in his face. (*See id.*) Instead, Plaintiff next cites three irrelevant lines in her deposition, in which she discussed a dedication ceremony that took place in 2002. (*Id.*, RSOF ¶ 34 [citing Ex. 28 at 55 ln. 1–3 (Pl. Dep.)].) Next, Plaintiff cites nine pages of the testimony of a supervisor who was not employed by Defendant at the time of the incident. (*Id.*, RSOF ¶ 34 [citing Ex. 30 at 64–72 (Armstrong Dep.)].) Finally, Plaintiff cites an unidentified, unauthenticated handwritten page stating: "Dan Gallegos. Negativity and rudeness of [Plaintiff] — Wouldn't speak to Dan on his first or [second] day — Told Suzanne not to allow Dan or anyone to not [sic] use any of the facilities equip[ment]." (*Id.*, RSOF ¶ 34 [citing Ex. 20 at 12 (Undated Notes)].) Obviously, none of this slurry of evidence controverts Defendant's asserted fact. Consequently, the fact is deemed admitted.

112 [Reid Dep.]; *see* Def.'s Br., Ex. Q [8/4/04 Mem.].)  In the meeting, Mr. Reid asked Plaintiff

the following question approximately three times: "[A]re you going to be nice and friendly with

me or are we going to just work together as coworkers[?]"  (Pl.'s Resp., Ex. 28 at 94 [Pl. Dep.].)

By asking this question, Plaintiff felt that Mr. Reid "was trying to push me into getting angry

or . . . insubordinate.  And I said — so I said, Mike, you know, this is a mind game.  And oh, that

set him off. . . .  And he said, [']alright effective immediately, you're on administrative leave until

Monday.[']  And I just said, [']you know . . . .  I have to leave, I get it, I quit.[']"  (*Id.*, Ex. 28 at

95 [Pl. Dep.].)  At 4:00 P.M. that day, Plaintiff sent Mr. Gallegos an email stating: "Listen, I feel

bad that your first week . . . had to start off with such drama.  I want you to know that my leaving

has nothing to do with you."  (Def.'s Br., Ex. T [8/4/04 Email].)  Thereafter, Plaintiff deposited a

resignation letter on Ms. Carter's desk, packed her things, and left the premises.  (*Id.*, SOF ¶ 56;

*admitted at* Pl.'s Resp., RSOF ¶ 56.)

When Mr. Reid and Dr. Davis told Plaintiff's maintenance crew that she had resigned, the

crew indicated that it wanted Plaintiff to return.  (Pl.'s Resp., Ex. 29 at 115–16 [Reid Dep.].)  Dr.

Davis met with Plaintiff, and she agreed to return at the end of August.  (*Id.*, Ex. 28 at 169–70

[Pl. Dep.].)  In a memorandum dated August 19, 2004, Dr. Davis confirmed that Plaintiff would

return to work for Defendant and noted that Plaintiff would be required to "meet with [Dr. Davis]

on a regular basis to discuss [her] performance and interaction with fellow employees and

community members."  (Def.'s Br., Ex. W [8/19/04 Rehiring Mem.].)[6]

---

[6]Plaintiff asserts: "tone in the [memorandum] was contrary to the conversations . . . about
her conditions for returning to campus.  The tone was a shocking disappointment and surprise to

Before Plaintiff returned, Mr. Reid resigned to take a position with a college in Pennsylvania. (*Id.*, SOF ¶ 59; *admitted at* Pl.'s Resp., RSOF ¶ 59.) When Plaintiff returned, Ms. Colleen Armstrong became Plaintiff's supervisor. (Pl.'s Resp., SAF ¶ 56; *admitted in relevant part at* Def.'s Reply RSAF ¶ 56.)

### iv.     *Plaintiff Raises Concerns About Mr. Gallegos*

On March 29, 2005, Plaintiff sent Mr. Gallegos an email ordering him to stop installation of a water line. (*Id.*, Ex. 20 at 58 [3/29/05 Email].) Plaintiff explained that if the line involved potable water, it would need to be installed by a plumber. (*Id.*) Plaintiff further stated that she should have been notified of the project. (*Id.*) Mr. Gallegos' subordinate, Kerry Hart, appears to have been responsible for the project. (*See id.*, Ex. 20 at 58 [3/30/05 Email].) In an email to Mr. Gallegos, Mr. Hart explained that the line was for irrigation and did not involve potable water. (*Id.*)

On March 30, 2005, Plaintiff complained to Ms. Armstrong that Mr. Gallegos was frequently absent from campus and that, consequently, her department was having to cover for him. (*Id.*, SAF ¶ 73; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 73; *see* Pl.'s Resp., Ex. 1 at 1 [6/7/05 Mem.].) Plaintiff asked Ms. Armstrong not to tell Mr. Gallegos she had made the complaint. (Pl.'s Resp., Ex. 28 at 99 [Pl. Dep.].) Ms. Armstrong looked into the complaint and found that Mr. Gallegos worked irregular hours in order to supervise his employees. (Def.'s Br., SOF ¶ 81; *deemed admitted at* Pl.'s Resp., RSOF ¶ 81; Def.'s Br., Ex. C at 102 [Armstrong

[Plaintiff]." (Pl.'s Resp., RSOF ¶ 62.) Nevertheless, Plaintiff admits she never expressed this opinion to *anyone* prior to her deposition. (*Id.*, Ex. 28 at 171 [Pl. Dep.].)

Dep.].)[7]  Mr. Gallegos' staff worked staggered shifts, which ran virtually around the clock.  (*Id.*, SOF ¶ 83; *admitted at* Pl.'s Resp., RSOF ¶ 83.)

Ninety minutes after Plaintiff left Ms. Armstrong's office, Mr. Gallegos called Plaintiff and asked to meet with her the next day.  (Pl.'s Resp., Ex. 28 at 99–100 [Pl. Dep.].)  On March 31, 2005, they met, and Mr. Gallegos confronted Plaintiff about her conversation with Ms. Armstrong.  (*Id.*)  The same day, Mr. Gallegos sent Ms. Armstrong an email noting that he had met with Plaintiff and they had agreed to "keep the lines of communication open."  (*Id.*, Ex. 2 [3/31/05 Email].)  From then on, Plaintiff felt that Mr. Gallegos "made it his mission to do whatever he could to run me out of there because I had told on him."  (*Id.*, Ex. 28 at 100 [Pl. Dep.].)

On April 13, 2005, Plaintiff, Mr. Gallegos, Mr. Hart, and others had a meeting regarding the irrigation line that Plaintiff had sought to halt.  (*See id.*, Ex. 20 at 66–67 [4/13/05 Mem.].)  Mr. Gallegos documented his purported recollections of the meeting in a memorandum, recounting, *inter alia*, that he told Plaintiff "it would have been best for her to have resolved any and all of the ongoing personal issues she has with [Mr. Hart] when she was still his manager and not keep hanging on to her negative feelings moving into the future."  (*Id.*)

_____

[7]Plaintiff denies that Ms. Armstrong looked into her complaint based on irrelevant statements made by Plaintiff and others lacking any personal knowledge of how Ms. Armstrong responded to the allegations.  (*See* Pl.'s Resp., RSOF ¶ 81); *see also* Fed. R. Civ. P. 56(e)(1) (2008) (requiring affidavits to be premised on personal knowledge).  Accordingly, Defendant's asserted fact remains undisputed and must be deemed admitted.

On May 3, 2005, Ms. Armstrong completed Plaintiff's performance evaluation for June 2004 through May 2005. (*Id.*, Ex. 20 at 73–79 [2004–2005 Eval.].) Ms. Armstrong gave Plaintiff an overall rating of "Meets Expectations," noting "[Plaintiff] does a really good job in project management. She is thorough in her work and detail oriented." (*Id.*, Ex. 20 at 78 [2004–2005 Eval.].) However, Ms. Armstrong also wrote that Plaintiff was perceived as "territorial," "unapproachable," and "difficult to work with" and, thus, needed "to improve in the area of communication" and "learn the art of diplomacy and delegation." (*Id.*, Ex. 20 at 77–78 [2004–2005 Eval.].)

On May 13, 2005, Ms. Ruybal stopped by Plaintiff's office unexpectedly and asked Plaintiff to join her in meeting with Perry Sherwood of Towner Engineering. (*Id.*, SAF ¶¶ 77–78; *admitted in relevant part at* Def.'s Reply, RSAF ¶¶ 77–78.) Plaintiff recalls that Mr. Sherwood requested some architectural and engineering drawings in a "rude" and "insistent" manner. (*Id.*, Ex. 29 at 127 [Pl. Dep.].) Plaintiff recalls that she may have raised her voice in response, but that "I was very professional that day. I was very clear that — I was being pushed and I wasn't going to get down on his [sic] feet and kiss him and say, I'm sorry I don't have this drawing." (*Id.*, Ex. 29 at 133 [Pl. Dep.].) Plaintiff departed from the meeting, telling Mr. Sherwood "you're just going to need to come back" and "I've got a lot going on, I don't know where this fits in my priorities, if I need to be spending time on that." (*Id.*, Ex. 29 at 128, 132 [Pl. Dep.].) Later that day, Ms. Ruybal complained to Ms. Armstrong about Plaintiff's "un-professionalism" in the meeting. (Def.'s Br., Ex. LL [5/13/05 Email].)

On May 18, 2005, Mr. Gallegos created another memorandum, purporting to detail a phone call he received from Plaintiff. (Pl.'s Resp., Ex. 20 at 85–86 [5/18/05 Mem.].) Therein, Mr. Gallegos reported a heated conversation, in which he asked Plaintiff to "stop her ranting and raving" and to drop her "personal vendetta" against Mr. Hart. (*Id.*, Ex. 20 at 85 [5/18/05 Mem.].) Mr. Gallegos wrote:

> I absolutely feel that [Plaintiff] is personally attacking me . . . and is retaliating against me for her poor employee performance evaluation. She also creates a very tense and negative work environment to be in, this causes me a great deal of stress and emotional discomfort. . . . I also feel that she makes a lot of negative comments about me and my staff to her staff members . . . and this cause [sic] a lot of dissension and separation between the two departments . . . .

(*Id.*, Ex. 20 at 86 [5/18/05 Mem.].)

### v. *Plaintiff's Termination*

On May 26, 2005, Mses. Armstrong and Ruybal met with Plaintiff to discuss her behavior. (Def.'s Br., SOF ¶ 104; *admitted at* Pl.'s Resp., RSOF ¶ 104.) Plaintiff was "shocked" when Ms. Armstrong raised concerns regarding Plaintiff's interactions with Mr. Gallegos and Mr. Sherwood. (Pl.'s Resp., Ex. 29 at 226 [Pl. Dep.].) Ms. Armstrong had prepared a letter of reprimand to give to Plaintiff during the meeting, but did not issue the reprimand that day. (*Id.*, SAF ¶ 85; *admitted at* Def.'s Reply, RSAF ¶ 85.) Plaintiff asserts that she raised concerns about the truth of the complaint Mr. Gallegos had made against her and, thus, at the end of the meeting, Mses. Armstrong and Ruybal said, "['] we need to get [Mr. Gallegos] and [Plaintiff] in the same room . . . to work out some things.[']" (*Id.*, Ex. 28 at 228–29 [Pl. Dep.].) Ms. Armstrong

scheduled a meeting for June 8, 2005, with Plaintiff, Mr. Gallegos, Ms Ruybal, and herself. (Def.'s Br., SOF ¶ 107; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 107.)

Minutes before the June 8, 2005, meeting was to begin, Plaintiff submitted a memorandum to Ms. Armstrong responding to "the allegations from Dan Gallegos claiming harassment from [sic] me." (*Id.*, Ex. 1 at 1 [6/7/05 Mem.]; *see* Def.'s Br., SOF ¶ 108; *admitted at* Pl.'s Resp., RSOF ¶ 108.) Ms. Armstrong cancelled the meeting so she could review the memorandum. (Def.'s Br., SOF ¶ 109; *admitted at* Pl.'s Resp., RSOF ¶ 109.)

In the memorandum, Plaintiff asserted that Mr. Gallegos had fabricated complaints about her in order to get back at her for complaining to Ms. Armstrong on March 30, 2005, about his absence from work. (Pl.'s Resp., Ex. 1 at 1 [6/7/05 Mem.].) Plaintiff further asserted that Ms. Ruybal had reported Plaintiff's behavior in the Towner Engineering incident in order to cover for Ms. Ruybal's own "mishandl[ing of] contractor visits to campus." (*Id.*, Ex. 1 at 2 [6/7/05 Mem.].) Plaintiff complained that Ms. Armstrong had "ambushed" her with the May 26, 2005, meeting and asserted that Ms. Armstrong had "ma[d]e the situation worse [by] withholding accusations from [Plaintiff], preventing [her] from a prompt response." (*Id.*) Plaintiff concluded her memorandum: "I can't imagine how I will be able to work positively with [Mr. Gallegos], who has used false information to hurt me and my reputation. Trust and respect are pretty much impossible now. My immediate concern is defending myself and my reputation. I am prepared to do this legally if necessary." (*Id.*, Ex. 1 at 3 [6/7/05 Mem.].)

Ms. Armstrong perceived the memorandum as evidence that Plaintiff was not willing to "sit down and try to work through the issues." (Def.'s Br., Ex. C at 61 [Armstrong Dep.].) Ms.

Armstrong felt Plaintiff's conduct exhibited an "inability or refusal to improve her working relationships with [Defendant's] staff and vendors." (Pl.'s Resp., Ex. 21 at 8 [Answer to Interrog.].) On June 10, 2005, Ms. Armstrong terminated Plaintiff. (Def.'s Br., SOF ¶ 112; *admitted at* Pl.'s Resp., RSOF ¶ 112.) Thereafter, Defendant hired a male to assume Plaintiff's position. (Pl.'s Resp., SAF ¶ 92; *admitted at* Def.'s Reply, RSAF ¶ 92.)

## 2.     *Procedural History*

On November 29, 2006, Plaintiff filed her complaint in this court, alleging she had been terminated based on her gender. (Compl. [filed Nov. 29, 2006] [hereinafter "Compl."].) On July 30, 2007, Defendant filed its motion for summary judgment, arguing: (1) Plaintiff cannot establish a *prima facie* case of discrimination; (2) it terminated Plaintiff for a legitimate, nondiscriminatory reason; and (3) the record is devoid of evidence that such reason was pretext for discrimination. (Def.'s Br.) On September 10, 2007, Plaintiff filed a response brief. (Pl.'s Resp. Br. in Opp'n to Def.'s Mem. Br. in Supp. of its Mot. for Summ. J. [filed Sept. 10, 2007].) On September 11, 2007, I struck Plaintiff's response brief due to its "egregious disregard" of my procedural rules and this district's local rules of practice. (Order [filed Sept. 11, 2007].) On October 1, 2007, Plaintiff filed a revised response. (Pl.'s Resp.) On October 24, 2007, Defendant filed its reply. (Def.'s Reply.) This matter is fully briefed.

## ANALYSIS

## 1.     *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation of Claims*

Plaintiff's response brief contains thirty-four pages of substance. Of those thirty-four pages, *twenty-nine* are devoted to factual allegations and *five* are devoted to argument.

(*Compare* Pl.'s Resp. at 4–33, *with id.* at 34–38.)  In those five pages of argument, Plaintiff does not offer *even one* citation to the record.  (*See id.* at 34–38.)  If those five pages of argument were closely tailored to the facts in this case, this gaping omission might not be entirely problematic.  However, in those pages, Plaintiff makes only the most *general* reference to the facts of the case, neglecting to point the court to any "***specific facts*** showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2) (2008) (emphasis added).  This problem is only compounded by counsel's  attempt to manipulate the factual record in Plaintiff's statement of facts.  (*See* Facts § 1a, *supra.*)

Apparently, Plaintiff's counsel thinks it is this court's job to look to Plaintiff's statement of facts and then divine: (1) which facts support Plaintiff's sweeping generalizations about the record; (2) what to do about those facts that undermine her generalizations; and (3) what to do with those potentially relevant facts Plaintiff endorses in her statement of facts, but then abandons wholesale in her argument.  The Tenth Circuit has presciently addressed almost this very situation:

> Plaintiff's opening brief has an introductory "Statement of the Facts" containing a lengthy, discursive account of her employment with defendant.  However, this amalgamation of background information, potentially relevant complaint, and incidental aspersion is not systematically tied by reference to the later legal/argumentative sections of the brief, some of which are devoid of particularized factual or evidentiary references of their own.  In effect, plaintiff has presented a mass of miscellaneous material and left it to this court to collect, organize, and articulate the cumulative legal significance of pertinent items therein with respect to each of her various claims.  This court does not construct or flesh out a[] [party's] arguments; *rather, it is the [party's] responsibility to tie the salient facts, supported by specific record citation, to her legal contentions. . . .* [Such] a[] [judicial] supplementation of the nonmovant's presentation would not be fair either to the movant or to the [] court.

*Schaede v. Boeing Co.*, 72 F.3d 138, 1995 WL 736464, at *1 (10th Cir. Dec. 13, 1995) (table) (emphasis added). Thus, "[i]t is not this court's task to comb through Plaintiff's voluminous submissions in an effort to link alleged facts to [her] arguments or to construct Plaintiff's arguments for [her]." *Barcikowski v. Sun Microsys., Inc.*, 420 F. Supp. 2d 1163, 1179 (D. Colo. 2006); *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Indeed, "district courts . . . have a limited and neutral role in the adversarial process, and [ought to be] wary of becoming advocates who comb the record of previously available evidence and mak[ing] a party's case for [her]." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (citations omitted). "If the rule were otherwise, the workload of the district courts would be insurmountable . . . ." *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000).

Plaintiff's counsel has wholly abdicated the responsibility to "tie the salient facts, supported by specific record citation, to [Plaintiff's] legal contentions." *See Schaede*, 1995 WL 736464, at *1. Moreover, even setting aside the fact that Plaintiff's argument is entirely devoid of record citations, many of her arguments are so ephemeral that they only vaguely suggest those "specific facts" to which they might relate. Thus, this case does not merely present the problem of connecting the dots between Plaintiff's argument and her factual allegations. Instead, the bulk of Plaintiff's arguments themselves are so vague that in order to render them coherent, *the court* would have to comb the record for facts *it* deems material thereto and then cobble those facts together in a manner *it* deems sensible. This, however, is not the role of a court. It is the role of an advocate. Where, as here, counsel has abdicated his role, it cannot be said that Plaintiff has

carried her burden of designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). Consequently, summary judgment is warranted on these grounds alone.

### a.     *Discriminatory Discharge*

Alternatively, even when the court undertakes to link Plaintiff's arguments to record evidence, the conclusion that Defendant is entitled to judgment as a matter of law is still unavoidable. In this subsection, I venture to attempt to link Plaintiff's rough-hewn arguments to the evidence of record. In light of the unfairness to Defendant of having the court step into the role of Plaintiff's counsel, I will focus narrowly on those arguments Plaintiff actually made in her brief — rather than the many arguments Plaintiff should have made but did not.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (2006). Because Plaintiff relies on circumstantial evidence to establish unlawful discrimination, I apply the familiar three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973); *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The aggrieved employee must first establish a *prima facie* case of prohibited employment action. *Plotke*, 405 F.3d at 1099. If the employee makes such a showing, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer meets this burden, then "summary judgment is warranted unless the employee can

show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.*

### i. The **Prima Facie** *Case*

In her complaint, Plaintiff alleged only one cause of action: discriminatory discharge. (*See* Compl. ¶ 21.) On summary judgment, Defendant asserts that this claim should be evaluated under the disparate treatment *prima facie* standard, and then proceeds to argue that Plaintiff failed to present evidence that "similarly situated employees were treated differently." (*See* Def.'s Br. at 23–24.) In her response, Plaintiff does not contest Defendant's characterization of the case as one of disparate treatment. (*See* Pl.'s Resp. at 36–37.) Nonetheless, case law does not support Defendant's statement of the law.

To make out a *prima facie* case of disparate treatment under Title VII, the plaintiff must show: (1) membership in a protected class; (2) an adverse employment action; and (3) disparate treatment among similarly situated employees. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). However, in the discriminatory discharge context, the plaintiff need only show that: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002); *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (finding district court erred in requiring a showing of disparate treatment of similarly situated employees at the *prima facie* stage of a discriminatory discharge case). In light of the fact that Plaintiff's complaint unequivocally

alleges discriminatory discharge, I find that Defendant's reliance on the broader disparate treatment standard is inappropriate.

As Defendant's sole attack of Plaintiff's *prima facie* case pertains only to a lack of evidence of disparate treatment of similarly situated employees, Defendant's argument is unavailing at this stage. (*See* Def.'s Br. at 23–24); *cf. Kendrick*, 220 F.3d at 1232 (considering disparate treatment of similarly situated employees as evidence of pretext). Because Defendant has not validly attacked Plaintiff's *prima facie* case, I cannot say that Defendant has undermined any element thereof.[8] Accordingly, I proceed to the subsequent steps of *McDonnell Douglas*.

### ii. Nondiscriminatory Reason, Pretext

Defendant asserts it terminated Plaintiff because of her "inability or refusal to improve her working relationships with [Defendant's] staff and vendors." (*See* Pl.'s Resp., Ex. 21 at 8 [Answer to Interrog.].) I find that Defendant has proffered a sufficient nondiscriminatory for Plaintiff's termination. *See Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007) (en banc) (noting a defendant's burden of production at this stage is "exceedingly light").

Once a defendant's burden of production is met, the plaintiff may "resist summary judgment, either by presenting evidence that the employer's reason is pretextual, *i.e.*, unworthy of

---

[8]Although Plaintiff neglects to argue as much, the record contains *prima facie* proof. First, it beyond dispute that Plaintiff is female. Second, Plaintiff was given three consecutive yearly evaluations, each stating that her performance was at least satisfactory. (*See* Pl.'s Resp., Ex. 15 at 33–37 [2002–2003 Eval.], Ex. 15 at 87–94 [2003–2004 Eval.], Ex. 20 at 73–79 [2004–2005 Eval.].) Thus, there is *prima facie* evidence that Plaintiff was qualified for her job. Third, it is beyond dispute that Plaintiff was terminated. Finally, it is undisputed that a male was hired to fill her position. (Pl.'s Resp., SAF ¶ 92; *admitted at* Def.'s Reply, SAF ¶ 92.)

belief, or by otherwise introducing evidence of a discriminatory motive." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002). Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* In evaluating pretext evidence, "the relevant inquiry is not whether the employer's reasons were wise, fair or correct; [it] is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citation omitted). Thus, a court must consider the facts as they appeared to the person making the decision, and a court will not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Id.* at 1119.

Plaintiff makes two pretext arguments: (1) Defendant's use of "subjective criteria" to support Plaintiff's termination "is evidence of pretext;" and (2) similarly situated male employees were treated more favorably than she. (Pl.'s Resp. at 36–38.) Below, I attempt to link such arguments to the evidence, and then I attempt to evaluate them.

### (a)     Subjective Criteria

Plaintiff's first — and *most* concrete — argument is that she is entitled to an inference of pretext because Defendant relied on "subjective criteria" to fire her. (*Id.* at 37.) It is true that "[c]ourts view with skepticism the use of subjective evaluations in making termination decisions." *Plotke*, 405 F.3d at 1106. Nevertheless, the Tenth Circuit has "consistently recognized that such criteria must play some role in management decisions and accordingly has reviewed the use of

subjective factors on a case-by-case basis." *Green v. New Mexico*, 420 F.3d 1189, 1195 (10th

Cir. 2005) (quotations omitted). Thus, the use subjective criteria, when coupled with the fact that

those making the employment decisions were not members of the protected group and had

engaged in past discrimination, has been considered proper evidence of discrimination. *Id.* (citing

*Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1272 [10th Cir. 1988]); *see also Riggs*, 497 F.3d at 1120

("[T]he existence of subjective criteria alone is not considered evidence of pretext; rather, the

existence of other circumstantial evidence may provoke a stronger inference of discrimination in

the context of subjective evaluation standards."). Additionally, the Tenth Circuit "has recognized

on numerous occasions that a plaintiff can defeat summary judgment by demonstrating that an

evaluation offered to justify [her] termination conflicts with other assessments of [her] work

performance." *Zuniga v. Boeing Co.*, 133 F. App'x 570, 574–75 (10th Cir. 2005) (citing *Garrett

v. Hewlett-Packard Co.*, 305 F.3d 1210, 1219 [10th Cir. 2002]; *Greene v. Safeway Stores, Inc.*,

98 F.3d 554, 564 [10th Cir. 1996]; *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1380 [10th Cir.

1994]).

     After reviewing the record in this case, I find no merit to Plaintiff's argument. To begin,

"[Plaintiff] was evaluated and reprimanded by another woman, Ms. [Armstrong]. Ms.

[Armstrong] is a member of the same protected class — women — as [Plaintiff]. Moreover,

there is nothing in the record indicating that Ms. [Armstrong] had engaged in discriminatory

conduct in the past." *Green*, 420 F.3d 1189, 1195–96 (considering plaintiff's arguments

regarding reliance on subjective factors). These undisputed facts strongly undermine any

inference of pretext. *See id.*; *Pitre*, 843 F.2d at 1272.

Additionally, Plaintiff cannot allege that Defendant's proffered reason for terminating her "conflicts with other assessments of [her] work performance." *See Zuniga*, 133 F. App'x at 574. Ms. Armstrong asserts that she terminated Plaintiff because of her "inability or refusal to improve her working relationships with [Defendant's] staff and vendors." (Pl.'s Resp., Ex. 21 at 8 [Answer to Interrog.]). This assessment dovetails with conclusions of four different people over a span of three years. In 2003, Plaintiff herself wrote: "Occasionally my frustration has resulted in negative interactions with staff and customers." (*Id.*, Ex. 15 at 34 [2002–2003 Eval.].) In 2004, Mr. Reid wrote: "[Plaintiff's] management and leadership skills are not presently adequate for this position. . . . Managing people, not projects, is the most critical aspect of this position." (*Id.*, Ex. 15 at 91 [2003–2004 Eval.].) Also in 2004, after Plaintiff quit her job in connection with the golf cart fiasco, Dr. Davis rehired Plaintiff with the proviso that she meet regularly with him to discuss her "interaction with fellow employees and community members." (Def.'s Br., Ex. W [8/19/04 Rehiring Mem.].) In 2005, Ms. Armstrong wrote: "[Plaintiff] is often construed by others as unapproachable and difficult to work with. . . . [Plaintiff] needs to be not so territorial . . . ." (Pl.'s Resp., Ex. 20 at 78 [2004–2005 Eval.].) Thus, the reason Ms. Armstrong offered for Plaintiff's termination does not *conflict* with Plaintiff's prior performance evaluations; it *comports* with them. Consequently, Plaintiff cannot "demonstrat[e] that [the reason] offered to justify [her] termination conflicts with other assessments of [her] work performance." *Zuniga*, 133 F. App'x at 574–75.

Finally, it must be noted Mr. Reid recommended that Plaintiff be hired over a male candidate *because* Plaintiff's references stated that she was "collegial" and had a talent for

"bringing out the best in people," whereas the male candidate's references indicated he was "forceful," "pushy," and "had a tendency to step on toes." (Def.'s Br., Ex. A [1/16/02 Mem.].) If Plaintiff was hired based on references stating that she exhibited the subjective characteristic of "collegiality," then it is difficult to infer pretext when there is ample evidence that, subsequently, she was fired because she was perceived to be "confrontational," "territorial," and unwilling "to improve her working relationships with [Defendant's] staff and vendors." (*See, e.g.*, Pl.'s Resp., Ex. 20 at 78 [2004–2005 Eval.], Ex. 21 at 8 [Answer to Interrog.].) In light of the foregoing, I find that no reasonable juror could infer that the "subjective" reasons offered to justify Plaintiff's termination constituted a pretext for discrimination.

### (b)    *Disparate Treatment*

With respect to disparate treatment, Plaintiff makes two arguments. First, Plaintiff contends that "[o]nly [she] was fired" for being "rude, unprofessional, and lack[ing] appropriate communication skills," even though Mr. Reid, Mr. McGregor, and Defendant's former president, Joe May, exhibited "these same traits." (*Id.* at 36.) Second, Plaintiff contends that Ms. Armstrong "consistently gave [Mr. Gallegos] favorable treatment." (*Id.* at 37.) Defendant disputes the adequacy of Plaintiff's endeavor to make the necessary showing that she was "similarly situated" to any of these men. (*See* Def.'s Reply at 28–30.)

Evidence of disparate treatment may support an inference of pretext. *See McGowan v. City of Eufala*, 472 F.3d 736, 745–46 (10th Cir. 2006). To prove disparate treatment, Plaintiff must show she was similarly situated to Messrs. Reid, McGregor, May, and Gallegos in all

relevant respects. *Id.* at 745 (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 [10th Cir. 1997]).

> Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. In determining whether two employees are similarly situated, a court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees. Moreover, even employees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant.

*Id.* (internal citations omitted); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (holding that comparators "must be nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer").

Plaintiff does not even bother to argue that she was similarly situated to Mr. Reid, Mr. May, or Mr. McGregor (*See* Pl.'s Resp. at 37.) The court surmises that Plaintiff abandoned this necessary effort because of an absence of any evidence whatsoever supporting such a conclusion. With respect to Messrs. Reid and May, the evidence reveals that neither man had the same job as Plaintiff. Mr. Reid was Plaintiff's supervisor from February 2002 to August 2004. (Def.'s Br., SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7.) Mr. May was Defendant's president at some time *prior* to Plaintiff's tenure with Defendant. (*See id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8; Pl.'s Resp., Ex. 29 at 26 [Reid Dep.].) Because both men were Plaintiff's *superiors*, they can hardly be said to have "deal[t] with the same supervisor," let alone to have held the same position. *See McGowan*, 472 F.3d at 745–46 (noting that similarly situated employees "deal with the same supervisor" and rejecting the contention that parties who held different jobs were similarly

situated); *Medina v. Denver Pub. Schs.*, No. 05–cv–00299, 2006 WL 1795126, at * 5 (D. Colo. June 27, 2006) ("Employees who hold different positions with different job duties are not similarly situated."). Thus, I find that Plaintiff was not similarly situated to either Mr. Reid or Mr. May. Consequently, her assertion that she was treated differently than these men does not support a reasonable inference of pretext. *See McGowan*, 472 F.3d at 745.

With respect to Mr. McGregor, the comparison is stronger, since Plaintiff was hired to replace him. (*See* Pl.'s Resp., SAF ¶ 1.) Nevertheless, I must emphasize that Plaintiff makes *no argument* that she and Mr. McGregor were similarly situated. (*See id.* at 36.) In contrast, Defendant points out that while Plaintiff was an at-will employee, Mr. McGregor was a contract employee, subject to contractually mandated evaluation and discipline processes different from those applicable to Plaintiff. (*See* Def.'s Reply at 29 [citing Pl.'s Resp., Ex. 22 at 11 (EEO Resp.)].) Thus, the undisputed evidence reveals that Plaintiff and Mr. McGregor were not "subject to the same standards governing performance evaluation and discipline." *McGowan*, 472 F.3d at 745. Consequently, they were not similarly situated. *See id.*

Even if this were not the case, there is further evidence that Plaintiff and Mr. McGregor were not similarly situated. Recall that Plaintiff's disparate treatment allegation is quite narrow. Plaintiff alleges that although both she and Mr. McGregor were perceived as exhibiting rudeness and lack of professionalism, "[o]nly [Plaintiff] was *fired* for these flaws." (Pl.'s Resp. at 36 [emphasis added].) At the time Plaintiff was "fired for th[o]se flaws," her supervisor was Ms. Armstrong. (*See* Def.'s Br., SOF ¶¶ 7, 65; *admitted at* Pl.'s Resp., RSOF ¶¶ 7, 65.) Ms. Armstrong never supervised Mr. McGregor and, consequently, *never had occasion to discipline*

*him* for misconduct.  (*See id.*)  Thus, even assuming, momentarily, that Plaintiff has furnished

proof that Mr. McGregor engaged in conduct of comparable seriousness to that which Plaintiff

was terminated, it still would be *entirely* unreasonable for a jury to infer pretext from any

difference in the manner in which Ms. Armstrong treated Plaintiff from the manner in which Ms.

Armstrong's predecessor treated Mr. McGregor.  *See McGowan*, 472 F.3d at 745 (stating

similarly situated employees "deal with the same supervisor").  As such, Plaintiff has failed to

show that she and Mr. McGregor were similarly situated.

Plaintiff does muster a marginal effort to argue that she and Mr. Gallegos were similarly

situated, stating that they "dealt with the same supervisor, Armstrong" and asserting that both

"were subjected to the same standards governing performance, evaluation, and discipline."  (Pl.'s

Resp. at 37.)  While it is beyond dispute that Ms. Armstrong supervised both Plaintiff and Mr.

Gallegos, the court has found *absolutely no evidence* supporting Plaintiff's conclusory assertion

that both "were subjected to the same standards governing performance, evaluation, and

discipline."  Absent evidence on this front, I cannot find that Plaintiff has raised a genuine issue of

material fact.  *See MacKenzie v. Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) ("Unsupported

conclusory allegations . . . do not create an issue of fact.").

Even assuming that Plaintiff and Mr. Gallegos "were subjected to the same standards

governing performance, evaluation, and discipline," the law requires more parity than this before a

court may find that two workers are similarly situated.  As stated above, "even employees who

are similarly situated must have been disciplined for conduct of comparable seriousness in order

for their disparate treatment to be relevant."  *McGowan*, 472 F.3d at 745; *see EEOC v. Flasher*

*Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992) ("The infractions giving rise to the comparison need not involve exactly the same offenses; they need only be of comparable seriousness.").

Instead of making a *specific showing* that Mr. Gallegos engaged in "conduct of comparable seriousness" to that for which Plaintiff was terminated, Plaintiff instead ventures only this vague, disjointed, and aspersive argument, which, as noted above, is not supported by a even a single record citation:

> In episode after episode Armstrong sided with Gallegos, [sic] and against [Plaintiff]. In every instance, Gallegos either admitted he was at fault in the situation or [Defendant's] documents established this. Armstrong failed to advise [Plaintiff] of any deficiencies or complaints. Armstrong failed to ask [Plaintiff] her side of any dispute with Gallegos. Armstrong conferred secretly with Gallegos, leaving [Plaintiff] out, and then concluded, uniformly, that [Plaintiff] was at fault. Despite the objective proof that Gallegos was simply incompetent and [Plaintiff] performed at a level of excellence, Gallegos would be rated Outstanding and [Plaintiff] at [sic] the lowered rating of Meets Expectations.

(Pl.'s Resp. at 37.)

Thus, Plaintiff would argue to a jury that *Ms.* Armstrong was so manifestly blinded by sexist bias that, rather than simply firing Mr. Gallegos based on the "objective proof" of his "simple incompetence," she not only decided to keep Mr. Gallegos around but also to enter into a "secret" plan to blame Plaintiff (who "performed at a level of excellence") for "episode after episode" in which Mr. Gallegos blundered. This theory is entirely fanciful. Moreover, the allegations upon which it is premised are vague, unsupported, and conclusory. *See MacKenzie*, 414 F.3d at 1273. As such, the court declines to engage the theory any further.

On the whole, I find that Plaintiff has proffered no evidence that Ms. Armstrong's termination decision was based on discriminatory animus. Plaintiff has failed to raise a genuine

doubt about Defendant's motivation, or produce evidence refuting or showing that Defendant's stated reasons for terminating her were implausible, inconsistent, or unworthy of credence. Thus, summary judgment is proper.

### b. Hostile Work Environment

Plaintiff alleges that Defendant should be held liable because it "failed to investigate and eliminate the hostile environment, [to] which [Plaintiff] was subjected." (*Id.* at 34.) Defendant argues: (1) Plaintiff did not allege hostile work environment discrimination in her complaint; and (2) there is no evidence supporting a such a claim. (Def.'s Reply at 31–36.) Although Defendant is correct on both fronts, I need only address its first argument.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (2008). "The statement must give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Green Country Food Mkt. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 [1957]). Rule 8's liberalized pleading standards "do not permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Id.* (citing *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 [10th Cir. 1991]). "This practice, if tolerated, 'would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.'" *Id.* (quoting *Evans*, 936 F.2d at 1091). As the Eleventh Circuit has held:

> [The liberal pleading] standard . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. Efficiency and judicial economy require that the liberal pleading standards . . . are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a). *A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.*

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (emphasis added); *accord Tucker v. Union of Needletrades, Indust. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990).

Here, Plaintiff's complaint does not allege a claim for hostile work environment discrimination; it alleges a *single* theory: discriminatory discharge. (*See* Compl.) Whereas a showing of discriminatory discharge involves evidence related to qualification for the job and unjustified termination, *see Hysten*, 296 F.3d at 1181, a hostile work environment claim entails proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998). Plaintiff's complaint is utterly devoid of allegations that even begin to suggest she might pursue a theory based on being subjected to "intimidation, ridicule, and insult." (*See* Compl.) Thus, I find that "[t]he complaint did not place [Defendant] . . . on notice of the need to defend against a [hostile work environment] claim." *Green Country*, 371 F.3d at 1280. I further note that this lack of notice "was demonstrated by [Defendant's] failure to offer any defense to such a claim in

[its] initial motion for summary judgment." *Id.* Finally, I find that a claim for discriminatory discharge is "sufficiently distinguishable from" a hostile work environment claim that Plaintiff should have sought leave to amend her complaint if she wanted to pursue it. *See id.*

Moreover, Plaintiff has not even ventured an *explanation* of why she is asserting a new theory of her case on summary judgment. (*See* Pl.'s Resp.) Nor has she attempted to show how her eleventh hour assertion of a new theory would not be prejudicial to Defendant. (*See id.*) Absent any assertion whatsoever as to why "justice . . . requires" that leave to amend be granted at this late juncture, this court will not invent one on Plaintiff's behalf and then, contrary to this court's local rules, construe her summary judgment response as an implicit motion to amend. *See* Fed. R. Civ. P. 15(a) (2008) (stating that after a responsive pleading is filed, leave to amend "shall be freely given when justice so requires"); D.C.COLO.LCivR 7.1(C) (2007) ("A motion shall *not be* included in a response or reply . . . . A motion *shall* be made in a separate paper." [emphases added]); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) ("Having proceeded through discovery without amending [or seeking to amend] his complaint . . ., [plaintiff] [i]s not entitled to raise it in the midst of summary judgment."). Accordingly, I decline to consider Plaintiff's newly asserted hostile work environment claim.

## 3. *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANT's motion (#19) is GRANTED.

2.     The clerk shall forthwith enter judgment in favor of Defendant and against

Plaintiff, dismissing Plaintiff's claims with prejudice.  Defendant may have its costs

by filing a bill of costs within eleven days of the date of this order.

Dated this 1st day of February, 2008

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge